IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GOLO, LLC,

               Plaintiff,

      v.

GOLI NUTRITION INC., a Canadian Corp.,
and GOLI NUTRITION INC., a Delaware
Corp.,

               Defendants.

Civil Action No. 20-667-RGA

<u>MEMORANDUM OPINION</u>

Chad S. C. Stover, BARNES & THORNBURG LLP, Wilmington, DE; John Gabrielides
(argued), Genevieve E. Charlton, BARNES & THORNBURG LLP, Chicago, IL; Caitlin R.
Byczko, BARNES & THORNBURG LLP, Indianapolis, IN, Attorneys for Plaintiff.

Brian A. Biggs, DLA PIPER LLP, Wilmington, DE; Tamar Y. Duvdevani (argued), Kerry A.
O'Neill, DLA PIPER LLP, New York, NY; Safraz W. Ishmael, DLA PIPER LLP, Boston, MA,
Attorneys for Defendants.

September 1, 2020

/s/ Richard G. Andrews
**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Before me in this trademark infringement action is Plaintiff GOLO, Inc.'s motion for a preliminary injunction. (D.I. 10). I have reviewed the parties' briefing. (D.I. 11, 29, 46). I heard oral argument on August 14, 2020.  For the following reasons, I will deny Plaintiff's motion.

## I.      BACKGROUND

Goli Nutrition[1] was founded in October 2018, and began selling its only product, Goli apple cider vinegar gummies, on April 19, 2019. (D.I. 29 at 2). Goli gummies are marketed as a chewable gummy supplement that has the health and wellness benefits of apple cider vinegar without the taste. (*Id.*). Goli sells its product in brick-and-mortar stores, amazon.com, walmart.com, and its own website, among other platforms. (*Id.* at 6).

GOLO has been developing dietary supplements and weight management products and services since 2011. (D.I. 1 at ¶ 13). GOLO sells a weight loss program called "GOLO for Life," and an accompanying diet pill in capsule form called "Release." Consumers can purchase GOLO's product from GOLO's website and walmart.com. (D.I. 11 at 3).





Plaintiff's Product (D.I. 34-1, Ex. A)                    Defendant's Product (D.I. 31-1 Ex. E)

---

[1] The case so far treats the two defendants as one entity, and I will do so too.

Plaintiff seeks a preliminary injunction enjoining Defendant from using the "Goli" mark and ordering all third parties who sell Goli's product to discontinue all such sales and recall any remaining Goli product. (D.I. 10-1 at 1-2).[2]

## II.   LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy," and "should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). A party seeking a preliminary injunction must satisfy the traditional four-factor test: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Id.* Injunctive relief "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

## III.   DISCUSSION

### A.   Likelihood of success on the merits

To prevail on its claim for trademark infringement and unfair competition under the Lanham Act, Plaintiff must first show that Defendant's mark will cause a likelihood of confusion.[3] *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000); *see also Kos Pharms.*, 369 F.3d at 708. Each company sells nutritional supplements or weight loss pills to consumers interested in healthy living, weight management, or weight loss. Whether the weight

---

[2] Plaintiff dropped its request for a recall at oral argument.

[3] The most relevant provision of the Lanham Act provides for civil liability when, without consent, a person uses in commerce a "colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a).

loss pills and the nutritional supplements are considered to be competing or non-competing goods, courts use the same analysis—the *Lapp* factors—to assess the likelihood of confusion:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors; and

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*A & H Sportswear*, 237 F.3d at 215. "None of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2011).

If plaintiff and defendant deal in competing products or services, "the court need rarely look beyond the mark itself." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994). Where plaintiff and defendant deal in non-competing products or services, the Third Circuit has held that "the court must look beyond the trademark to the nature of the products or services, and to the context in which they are marketed and sold. The closer the relationship between the products or services, and the more similar their sales contexts, the greater the likelihood of confusion." *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.

4

1983). In determining whether the plaintiff's and defendant's products and services are in competition, Courts have examined whether the products and services can be substituted or interchanged for one another. *See Safeguard Bus. Sys., Inc. v. New England. Bus. Sys., Inc.*, 696 F. Supp. 1041, 1044 (E.D. Pa. 1988).

One way to define "competitive" goods is that they are goods that are "reasonably interchangeable by consumers for the same purposes." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) (cellophane competitive with other wrapping materials); *United States v. Grinnell Corp.*, 384 U.S. 563, 574-75 (1966) (accredited central station protective services noncompetitive with other types of security and protection services); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (men's, women's and children's shoes each fall within separate competitive markets).[4] Related to the functional "interchangeability of products is whether purchasers are willing to substitute one product for the other." *See, e.g., E.I. du Pont*, 351 U.S. at 395).

Here, both products broadly relate to weight management, just as one might say that motorcycles and bicycles both relate to transportation. But each product is distinct in several ways. First, Goli gummies are focused on bringing apple cider vinegar to the consumer in a more palatable form, and GOLO's Release pills and services do not claim to contain apple cider vinegar at all. Second, Goli's product is advertised as a chewable gummy, whereas GOLO offers a pill and an accompanying booklet plan. Thus, in addition to there not being any evidence that purchasers would be willing to substitute one product for the other, I think the record suggests

---

[4] 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:23 (5th ed. 2020) derives the definition of "competitive goods" in the trademark context from antitrust caselaw. I do the same here.

that there is no logical argument for hypothesizing that they would be willing to do so.  I do not find them to be directly competing products.

For the following reasons, on balance, the *Lapp* factors favor Goli's position that Goli's mark does not present a likelihood of confusion.

### 1.     Degree of Similarity (*Lapp* Factor One)

"The single most important factor in determining likelihood of confusion is mark similarity." *A & H Sportswear*, 237 F.3d at 216. Marks are confusingly similar "if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183 (3d Cir. 2010). Side-by-side comparison of the two marks is not the proper method for analysis when the products are not usually sold in such a fashion. *A & H Sportswear*, 237 F.3d at 216. "Instead, an effort must be made to move into the mind of the roving consumer." *Id.* Courts determine similarity by evaluating the overall impression created by the sight, sound, and meaning of the marks, not a side-by-side comparison. *Sabinsa*, 609 F.3d at 183. Where "plaintiff and defendant deal in non-competing lines of goods or services," as here, the Third Circuit has held that "the court must look beyond the trademark to the nature of the products themselves, and to the context in which they are marketed and sold." *Lapp*, 721 F.2d at 462.

Here, GOLO and Goli share the first three letters of a four-letter word. Both are made-up words. GOLO and Goli share all but one letter, have the same number of syllables, and share the first syllable. Both words end in a vowel. The words are phonetically similar. *See Kos Pharms.*, 369 F.3d at 713, 715 ("Two names that look and sound similar will naturally seem even more

6

similar when there are no differences in meaning to distinguish them."); *Sabinsa*, 609 F.3d at 184.

   

Plaintiff's mark (D.I. 13-1, Ex. G)          Defendant's mark (D.I. 13-1, Ex. S)

Marks need not be identical to create a likelihood of confusion. *See McLean v. Fleming*, 96 U.S. 245, 253 (1877) ("[E]xact similitude is not required to constitute an infringement" if "the form, marks, contents, words, or the special arrangement of the same . . . is such as would be likely to mislead one in the ordinary course of purchasing goods"). "Marks may be confusingly similar in appearance despite the addition, deletion, or substitution of letters or words." Trademark Manual of Examining Procedure § 1207.01(b)(ii) (Oct. 2018) (citing cases). For example, the following marks are confusingly similar despite some differences in the spelling and arrangement of the words: BASEBALL AMERICA / BASEBALL AMERICANA;[5] NEWPORT / NEWPROT;[6] SUPERCUTS / SUPER CLIPS.[7] Therefore, the one-letter difference between the marks at issue in the present case does not preclude a finding of sufficient similarity.

---

[5] *Baseball Am., Inc. v. Powerplay Sports, Ltd.*, 2004 WL 1942057, at *4 (T.T.A.B. 2004) (concluding that, because the marks were alike visually and aurally, and were similar in connotation, the marks "create similar overall commercial impressions.").

[6] *Lorillard Tobacco Co. v. Cal. Imports, LLC*, 886 F. Supp. 2d 529, 535 (E.D. Va. 2012) (observing that the only difference between NEWPROT and NEWPORT was the transposition of the "O" and "R," and the marks were otherwise "virtually indistinguishable.").

[7] *Supercuts, Inc. v. Super Clips*, 18 U.S.P.Q.2d 1378, 1990 WL 302729, at *3 (D. Mass. Oct. 26, 1990) ( concluding that the marks were confusingly similar because they shared the designation "SUPER," and "CLIPS" and "CUTS" sound alike and "suggest the cutting of hair.").

While the words GOLO and Goli, on their own, are phonetically similar, similarity for the first *Lapp* factor is not determined merely by examining the GOLO and Goli marks in a vacuum, but rather by assessing the total commercial impression of each mark. *A & H Sportswear*, 237 F.3d at 216; *Ciba-Geigy Corp. v. Bolar Pharm. Co., Inc.*, 747 F.2d 844, 851 (3d Cir. 1984); *Zalatel v. Prisma Labs, Inc.*, 2017 WL 877302, at *4 (D. Del. Mar. 6, 2017) ("Certainly there is a degree of similarity between the look and sound of the words 'Prizmia' and 'Prisma.' However, the marketplace presents the two marks very differently, which distinct presentations create distinct commercial impressions.").

Here, I find that the GOLO and Goli marks are presented in a different fashion. For example, Defendant points to the fact that the GOLO mark is often accompanied by a slogan saying "GOLO for Life." (D.I. 29 at 10). GOLO is presented in all capital letters, where the first syllable is green and the second syllable is blue. Goli is advertised in red or black block letters on its website, or white block letters on its product, with all letters lowercase. Goli's mark is often accompanied by the phrase "Nutrition" and uses a leaf instead of a dot over the "i," apparently a reference to its apple-related content. While "GOLO" might be interpreted as a mash-up of two words, "go" and "low,"[8] "Goli" cannot be parsed in a similar manner that makes sense and seems to be a single, indivisible, made-up word.

Plaintiff sells a weight loss plan and accompanying capsule pill called "Release." Defendant, by contrast, sells a gummy nutritional supplement that contains the purported benefits of apple cider vinegar alongside additional vitamins. GOLO maintains a blue, white, and green color scheme on its metabolic plan labeling and its website overall. (D.I. 34-1, Ex. A). GOLO's

---

[8] I think the use of "lo" to substitute for "low" is fairly common, particularly in relation to diet.  I note the existence of the word "lo-cal" (low calorie) and products such as "lo-dough" (pizza dough) and So-lo (Goose Island beer).

"Release" pill is branded with orange text saying "Release" on an opaque white bottle, and smaller blue and green text saying "GOLO." (*Id.*). Goli's website does not appear to adhere as strongly to a color scheme but incorporates black, white, and red significantly. (*Id.*). Goli's logo is stylized in black or red text on its website and in white text on its translucent red product bottles, which are packaged in a red and white box. (*Id.*).

While I recognize that side-by-side comparison of the conflicting marks is improper if that is not the way buyers see the products in the market, I find that these distinctions in presentation have the overall effect of creating a difference between the marks in the mind of the consumer. The different stylization of the marks here is distinguishable from the "strikingly similar" logos ForsLean and ForsThin in *Sabinsa*, where each logo contained the respective product name, with the second syllable set off, placed in front of foliage to symbolize the Coleus forskohlii plant, from which the products were derived. 609 F.3d at 184 n.2. This case is also distinguishable from *Noblr, Inc. v. Nobl Insurance*, in which the differences in the parties' domain names did not reduce the level of confusion among consumers because both parties offered insurance. 2020 WL 1441615, at *2 (D. Del. Mar. 24, 2020). Here, Plaintiff's website homepage immediately touts the GOLO product's ability to aid in weight loss. Defendant's website features the apple cider vinegar gummy, promoting "all of the age old benefits of traditional ACV." (D.I. 34-1, Ex. A). The websites and the product bottles are highly distinguishable in their color schemes, font, and overall feel. Differences in the design, layout, and color scheme of the parties' websites and products are thus further likely to eliminate consumer confusion. *See A & H Sportswear*, 237 F.3d at 216.

On balance, I find that the first *Lapp* factor weighs against finding a likelihood of confusion.

### 2.      Strength of Mark (*Lapp* Factor Two)

To determine the strength of the mark, courts look to (1) the inherent features of the mark contributing to its distinctiveness or conceptual strength and (2) the factual evidence of the mark's commercial strength or of marketplace recognition of the mark. *See A & H Sportswear*, 237 F.3d at 221. Strong marks receive greater protection under the Lanham Act. *Id.* at 222.

#### a.   Conceptual Strength

The conceptual strength of a mark is determined by the classification of the mark into one of four categories: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Id.* at 221. On this spectrum, generic marks (such as "diet chocolate fudge soda") receive no trademark protection and arbitrary or fanciful marks (such as "Kodak") receive the highest level of trademark protection. *Id.* at 221-22. Arbitrary or fanciful marks "bear no logical or suggestive relation to the actual characteristics of the goods." *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir. 1986). A suggestive mark "suggest[s] rather than describe[s] the characteristics of the goods," and "imagination, thought or perception [is required] to reach a conclusion as to the nature of goods." *Id.* at 296, 298. Suggestive marks "may receive lesser protection than arbitrary marks," especially where third party use exists. *A & H Sportswear*, 237 F.3d at 222. "Under the Lanham Act, stronger marks receive greater protection" because they "carry greater recognition, [so that] a similar mark is more likely to cause confusion." *Id*. While generic marks do not receive trademark protection, arbitrary, suggestive, and descriptive marks with a demonstrated secondary meaning are entitled to trademark protection. *Checkpoint Sys.*, 269 F.3d at 283.

Plaintiff argues that GOLO is a made-up word with no meaning in the English language. (D.I. 11 at 13). Plaintiff asserts that GOLO neither describes nor suggests anything about

GOLO's goods or services. (*Id.*) Thus, as a coined or fanciful term, GOLO should receive "an expansive scope of judicial protection." (*Id.*, citing *Kos Pharms.*, 369 F.3d at 713).

Defendant points out that Plaintiff is a weight loss company whose core marks include GOLO For Life, GOLOSE WEIGHT, GOLOOK GREAT, GOLOVE LIFE. (D.I. 29 at 10). "GOLO" is the phonetic equivalent of the phrase "go low," which is how Plaintiff uses it in its slogan. (*Id.* at 11). This melding of words that are evocative of Plaintiff's services thus makes the GOLO mark suggestive, entitling it to lesser protection. (*Id.*, citing *A & H Sportswear*, 237 F.3d at 223).

GOLO's mark is suggestive to the extent that it requires consumer imagination to determine that GOLO's product serves as a means to "go low" with respect to weight loss, i.e., to lose weight. *See CrossFit, Inc. v. 2XR Fit Systems, LLC*, 2014 WL 972158, at *5 (D.N.J. Mar. 11, 2014) (While KODAK is a "coined term that does not exist in the English language," CrossFit is not as "'Cross' (as in cross training) and 'Fit' are real terms associated with exercise and health"); *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, 868 F. Supp. 2d 468, 485 (D. Md. 2012) (mark that "combines two words to create something that sounds like an English word, but is spelled differently" and "conjures" favorable images of the product/service is suggestive, not fanciful); *see also* note 8 *supra*.

Although the GOLO mark may be viewed as suggestive, it is not necessarily a "strong" mark. Defendant asserts that third parties have registered the term "GOLO" as a trademark, and has provided examples of eighteen products in the health and wellness category that begin with the letters "GO," and others that contain the word "GO." (D.I. 29 at 11; D.I. 34, Ex. F). These facts showing widespread third-party use of "GO" marks in the health and wellness field demonstrate that "GO" marks are common, and therefore, weak. *See, e.g.*, *A & H Sportswear*,

237 F.3d at 223; *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 476 (3d Cir. 2005); *Accu Personnel, Inc. v. AccuStaff, Inc.*, 823 F. Supp. 1161, 1166 (D. Del. 1993). The mark in question, however, is GOLO, in its entirety, and the evidence before the court does not amount to extensive use by third parties.

On balance, the conceptual strength of the "GOLO" mark weighs slightly in favor of finding a likelihood of confusion.

### b.  Commercial Strength

The focus of the commercial strength inquiry is on consumer recognition of the mark. *See A & H Sportswear*, 237 F.3d at 224. Evidence of money spent on advertising and increased sales figures are among the factors to be considered, "[a]lthough evidence of money spent does not automatically translate into consumer recognition." *Id.* "Merely setting forth the amount of money spent on advertising, while certainly relevant, does not suffice alone . . . to demonstrate a strong mark." *Primepoint, L.L.C. v. PrimePay, Inc.*, 545 F. Supp. 2d 426, 438 (D.N.J. 2008).

Plaintiff states that it has spent millions of dollars advertising its GOLO goods and services through various media and has distributed over one million bottles and countless materials bearing the GOLO mark. (D.I. 11 at 13). Plaintiff has more than 500,000 customers, most of whom live throughout the United States, and its sales are substantial and growing. (*Id.*). According to Plaintiff, these facts establish a "high level of commercial strength." (*Id.*, citing *Kos Pharms.*, 369 F.3d at 726).

The commercial strength of Plaintiff's mark is neutral. While there is indeed evidence that Plaintiff has spent millions of dollars advertising (D.I. 14, ¶10), there is no evidence that it

has achieved mark recognition in the nutrition or weight loss segments of the health industry.[9]
*See A & H Sportswear*, 237 F.3d at 221. Without a showing that advertising and marketing
expenditures have created actual consumer recognition of Plaintiff's mark, the dollar amount of
Plaintiff's advertising expenditures is not necessarily probative of the strength of its mark. *See
EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.*, 2006 WL 892718, at *7 (D.N.J.
Apr. 4, 2006). While Plaintiff's evidence that it has "distributed over one million bottles and
countless materials bearing the GOLO mark" (D.I. 11 at 13) is relevant for circumstantially
establishing an association in the minds of consumers between the mark and the provider of the
services advertised under the mark, it does not, in my view, demonstrate secondary meaning or
commercial strength in and of itself. *See Componentone, LLC v. Componentart, Inc.*, 2008 WL
4790661, at *12 (W.D. Pa. Oct. 27, 2008). The present record also lacks direct evidence, such as
consumer surveys, to show consumer recognition of the "GOLO" mark. *See Checkpoint Sys.*,
269 F.3d 270 n.10 (citing cases observing that customer surveys are a useful and direct method
of demonstrating whether a mark has achieved a secondary meaning).

In the absence of direct evidence demonstrating consumer recognition of Plaintiff's mark,
the present record does not support a finding that Plaintiff's mark enjoys the marketplace
recognition required to find that it has secondary meaning, or commercial strength under the
second *Lapp* factor. *See Primepoint*, 545 F. Supp. 2d at 438-39 ("merely setting forth the amount
of money spent on advertising, while certainly relevant, does not suffice . . . to demonstrate a
strong mark" without direct evidence of consumer recognition in the relevant marketplace). For

---

[9] There is a suggestion in the report of Plaintiff's survey expert that one of the flaws with the
report of Defendant's survey expert is that the "Eveready" test he relied upon does not work if
the senior mark (GOLO) is not a strong mark. (D.I. 46-1, ¶ 49).

these reasons, the combined conceptual and commercial strength of GOLO's mark weighs neutrally in favor of a finding of likelihood of confusion.

### 3.   Care and Attention of Consumers (*Lapp* Factor Three)

Under the third *Lapp* factor, I assess "the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase." *A & H Sportswear*, 237 F.3d at 215. "The degree of caution used by . . . ordinary consumers (or 'reasonably prudent buyers,' as they are often called) depends on the relevant buying class." *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 293 (3d Cir. 1991).[10] The "more important the use of a product, the more care that must be exercised in its selection." *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 293 (3d Cir.1991).

Plaintiff states that its customers purchase its product through websites, either its own or Walmart's. (D.I. 11 at 14). According to Plaintiff, because sales are "as easy as a couple of computer clicks," they may often be an impulse purchase. (*Id.*). According to its website, Plaintiff's "GOLO for Life Plan with 1 bottle of Release" costs $49.95. This increases to $79.90 for two bottles, and $99.90 for three bottles, when purchased together. According to Defendant's website, Goli gummies cost $19.00 for one bottle, with a discount available with the purchase of five bottles at once, for a total of $89.00.

Both parties' products fall into the general health category, an area which "raises the standard of care." *See, e.g.*, *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 364 (3d Cir. 2007); *see also Eniva Corp. v. Global Water Sols., Inc.*, 440 F. Supp. 2d 1042,

---

[10] Plaintiff contends that the standard of care exercised by the reasonably prudent purchaser is equal to that of the least sophisticated consumer in the class, citing *Ford*, 930 F.2d at 293. The Court in *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC* explained that the standard cited by Plaintiff applies only to cases where there are a mix of "professional" and nonprofessional buyers, which is not the case here. 511 F.3d 350, 364 (3d Cir. 2007).

1052 (D. Minn. 2006) ("niche wellness market [consumers] likely use care when selecting health-based products."); *Nature's Best, Inc. v. Ultimate Nutrition, Inc.*, 323 F. Supp. 2d 429, 434 (E.D.N.Y. 2004) (same). Plaintiff's offerings range from $49.95–$99.90 and courts have found that goods in that price range are not "impulse" purchases. *See, e.g.*, *Kate Spade LLC v. Saturdays Surf LLC*, 950 F. Supp. 2d 639, 646 (S.D.N.Y. 2013) ($40–100 apparel not "priced at an 'impulse' purchase level for most consumers.").

In *A & H Sportswear*, the Court affirmed a district court's finding that purchasers of $50–$70 women's swimwear were likely to be sophisticated. 237 F.3d at 225. In *McNeil Nutritionals*, the Court upheld a district court's conclusion that purchasers "exercise some heightened care and attention" when buying $4–$5 boxes of artificial sweeteners. 511 F.3d at 365. Consumers who purchase the parties' products at $19–$99.90 thus likely exercise at least a similar level of care as the purchasers in *A & H Software* and *McNeil Nutritionals*. Where goods are set at different price points, moreover, as here, consumers generally distinguish them. *See Kinbook, LLC v. Microsoft Corp.*, 866 F. Supp. 2d 453, 467 (E.D. Pa. 2012), *aff'd*, 490 F. App'x 491 (3d Cir. 2013); *R.J. Ants, Inc. v. Marinelli Enters., LLC*, 771 F. Supp. 2d 475, 495 (E.D. Pa. 2011). There is a difference of $30.90 between one bottle of Goli gummies and an initial purchase of GOLO's product.

Given the prices of the products, and that both products are health-related, I find that the buyers of the parties' products are relatively sophisticated and exercise a high degree of care when making a purchasing decision. Consequently, the third *Lapp* factor weighs in favor of Defendant.

4.      **Goli's Intent in Adopting the Mark (*Lapp* Factor Five)**

For this factor, "courts must look at whether the defendant chose the mark to intentionally confuse consumers," and a "defendant's intent will indicate a likelihood of confusion only if an intent to *confuse* consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's." *Sabinsa*, 609 F.3d at 187 (emphasis in original). "[E]vidence of intentional, willful and admitted adoption of a mark closely similar to the existing mark[] weighs strongly in favor of finding [a] likelihood of confusion." *Kos Pharms.*, 369 F.3d at 721. As part of this inquiry, the Court must consider "[t]he adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks or allegations of potential confusion." *Id.*

Plaintiff has provided no evidence of intent to confuse consumers. Goli, on the other hand, has provided a detailed explanation of how it selected its mark in good faith. (D.I. 29 at 17; D.I. 31 at ¶¶ 13-17). Plaintiff argues that Goli acted in bad faith because it continued to use its mark after Plaintiff demanded that it cease doing so. (D.I. 11 at 15). I do not think this is evidence of bad faith. Continuing to use the Goli mark just as equally supports an inference that Defendant disagrees with Plaintiff's infringement analysis. *See Am. Orthodontics Corp.*, 2017 WL 8776960, at *9. By Plaintiff's logic, if a defendant defends against a trademark lawsuit, that is evidence that the defendant should lose the lawsuit. I do not think that makes any sense.

This factor weighs against finding a likelihood of confusion.[11]

---

[11] The parties disagree on the law here. Plaintiff cites *Sabinsa* for the proposition that Goli's intent in adopting and continuing to use its mark cannot weigh against GOLO under any set of facts, but either favors GOLO or is neutral. (D.I. 11 at 16; citing 609 F.3d at 187). *Sabinsa* does not support Plaintiff's position at all, however. In that case, the Court noted that the intent factor involved disputed factual issues and thus was unable to hold that it favored either party as a matter of law. *Id.* at 188. On the record before me, there are no disputed factual issues as to Goli's intent in using its mark. In *A & H Sportswear*, the Court "discern[ed] no clear error or

5. **Length of Time Mark Used with No Actual Confusion (*Lapp* Factor Four) and Evidence of Actual Confusion (*Lapp* Factor Six)**

I will simultaneously evaluate two *Lapp* factors that "significantly overlap," *Primepoint*, 545 F. Supp. 2d at 441, "the length of time the defendant has used the mark without evidence of actual confusion arising," and evidence of actual confusion. *A & H Sportswear*, 237 F.3d at 215. On one hand, "[i]f a defendant's product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future. The longer the challenged product has been in use, the stronger this inference will be." *Checkpoint Sys.*, 269 F.3d at 291 (quoting *Versa Prods.*, 50 F.3d at 205).  On the other hand, "[e]vidence of actual confusion is not required to prove a likelihood of confusion." *Checkpoint Sys.*, 269 F.3d at 291. Contending that actual confusion exists in the marketplace, Plaintiff submits evidence of alleged confusion events from consumers. Defendant argues the confusion evidence Plaintiff has presented is *de minimis* and that a survey Defendant commissioned confirms this conclusion.

The Third Circuit has stated that "evidence of actual confusion may be highly probative of the likelihood of confusion" because of the difficulty in discovering instances where consumers or other third parties exhibit confusion. *Id*. Nevertheless, while "it takes very little evidence to establish the existence of . . . actual confusion," "a district court may weigh the sixth *Lapp* factor in favor of a defendant when it concludes that the evidence of actual confusion was

---

misapplication of law" in the District Court's weighing of the intent factor in the defendants' favor, where there was plenty of evidence that defendants created the disputed mark in good faith. 237 F.3d at 226.  Indeed, *Sabinsa* recognizes such a possibility, since after noting that the Court on appeal could not resolve disputed facts, the Court concluded, "we are unable to hold that [the intent factor] favors either party as a matter of law."  609 F.3d at 188.  The concluding sentence certainly implies that if the factual disputes were resolved in favor of the defendant, then the intent factor would also favor the defendant.

isolated and idiosyncratic." *McNeil Nutritionals*, 511 F.3d at 366; *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir. 1978) (extremely minimal evidence of actual confusion does not establish a "pattern of confusion in the marketplace"). With respect to actual confusion, "[i]t is within the District Court's discretion to consider the facts, and weigh them." *A & H Sportswear*, 237 F.3d at 227.

Plaintiff states that beginning in January 2020, in less than five months it experienced fifty-eight instances of confusion, growing to an additional ninety-seven instances in the intervening time since Plaintiff submitted its opening brief. (D.I. 11 at 4, 7, 9; D.I. 46 at 5). The evidence includes emails, Facebook posts, messages via the GOLO online store, phone calls, and voicemails in which consumers contacted GOLO to inquire or complain about some aspect of Goli's product or consumer experience with Goli.[12]  (D.I. 12-1, Ex. 1). Plaintiff notes that Defendant has also experienced at least fifty-five instances of confusion, totaling at least 210 instances of confusion in the record. (D.I. 46 at 5).

While Plaintiff offers the numerator in its determination of actual confusion events, its argument leads to the question: what is the denominator?

> Just as one tree does not constitute a forest, an isolated instance of confusion does not prove probable confusion. To the contrary, the law has long demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.

---

[12] The examples of actual confusion that Plaintiff cites overwhelmingly do not involve any evidence of consumers buying gummies thinking they were GOLO's product or of consumers buying a diet plan and Release thinking it was Goli's product.  That's where the reasonably prudent consumer exercises care with what he or she is going to be ingesting for some health-related reason.  Instead, the examples generally involve the often careless complaining in which frustrated consumers are apt to engage, which, due to the internet, has never been easier.

5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:6 (5th ed. 2020).

In order for evidence of an actual confusion event to be probative of a likelihood of confusion,

there must be "a causal connection between the use of similar marks and instances of actual

confusion. Evidence must be viewed in context." *Rockland Mortg. Corp. v. S'holders Funding,*

*Inc.*, 835 F. Supp. 182, 197 (D. Del. 1993).

Viewing the aforementioned instances of alleged actual confusion in their proper context,

I conclude that they do not function to weigh the sixth *Lapp* factor in Plaintiff's favor. I must

view the confusion events within the proper universe of the parties' interactions with third

parties. *See Checkpoint Sys.*, 269 F.3d at 298-99 (juxtaposing number of actual confusion

instances with "the large number of e-mails, customer inquiries, and other communications the[]

[parties] receive on a daily basis"); *see also EMSL Analytical,* 2006 WL 892718, at *10 (same).

Assuming that each of the confusion instances Plaintiff has submitted represent events where an

individual was actually confused because of the similarity of the parties' marks, 210 confusion

events, in the context of having 500,000 customers, would equate to 0.042 percent of Plaintiff's

customers, a *de minimis* showing of confusion. *See Scott Paper*, 589 F.2d at 1231 (nineteen

misdirected letters that the parties received during a period in which one party sold fifty million

cans of its products is "extremely minimal evidence" and does not demonstrate "a pattern of

confusion in the marketplace"); *EMSL Analytical*, 2006 WL 892718, at **9-10 ("Given that

EMSL works on approximately 233,000 projects each year, let alone the number of customer

inquiries that both parties receive annually, fifteen-twenty instances of confusion does seem de

minimis."). Defendant has provided a review of its own "confusion" evidence: since its April

2019 launch, across 1,568,848 customer communications, fifty-five of them, or 0.0035%,

mention "golo." (D.I. 29 at 15).

Crediting all these submissions, the evidence of actual confusion is isolated and idiosyncratic. *See A & H Sportswear*, 237 F.3d at 227. "Ownership of a trademark does not guarantee total absence of confusion in the marketplace." *Id.* Although some cases hold that, given the difficulty of proving actual confusion, relatively little showing on the part of the plaintiffs is required, others warn against using isolated instances of confusion to buttress a claim. *Id.*

Plaintiff cites *Country Floors, Inc. v. Partnership of Gepner & Ford* in support of its argument, stating that there, just four instances of actual confusion were enough to find in favor of the plaintiff. (D.I. 11 at 10). The instant case is distinguishable, however. In *Country Floors*, the Third Circuit reversed a grant of summary judgment in favor of a defendant where the plaintiff had adduced evidence that suppliers and other business contacts confused the plaintiff and defendant. Specifically, there was evidence that directory assistance had given a caller the number for the defendant's store rather than that of the plaintiff's showroom, that one of the defendant's stores received a past due notice and other materials intended for the plaintiff, that the number of inquiries about a connection between the parties had increased, and that an interior designer had confused the two stores. 930 F.2d 1056, 1064 (3d Cir. 1991). Here, Plaintiff has not submitted evidence other than the communications of consumers who contacted GOLO.

Similarly, Plaintiff argues that 210 actually confused consumers far exceeds the "few incidents" of actual confusion that *Kos Pharmaceuticals* holds to be "highly probative of the likelihood of confusion." (D.I. 46 at 5; citing *Kos Pharms.*, 369 F.2d at 720). In *Kos Pharmaceuticals*, sixty instances of actual confusion were "more than enough evidence," regardless of the total number of possible instances. 369 F.2d at 720. Like *Country Floors*, the type and variety of evidence credited by the Court in *Kos Pharmaceuticals* are distinguishable

from the case here, and included medical professionals providing patients the wrong drug samples and, on one occasion, improperly filling a prescription; doctors complaining to Kos representatives about "Advicor," when their complaints concerned Altocor; and medical professionals confusing Altocor samples with Advicor samples, Altocor representatives with Advicor representatives, or Altocor-sponsored events with Advicor-sponsored events. *Id*. Here, Plaintiff offers communications from consumers who purchased Goli, who are unsatisfied for whatever reason, and mistakenly contacted GOLO to complain.

Defendant had substantial sales of $23 million in 2019, a period for which Plaintiff does not submit any evidence of confusion. (D.I. 31-1, Ex. M). Even if 90% of these sales were business-to-business sales and not "retail sales" (*id.*; D.I. 46 at 3), the likelihood of confusion with which the Lanham Act is concerned is not limited to confusion of products among purchasers. *See Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 321 (3d Cir. 2015). That there is no evidence of confusion from April 2019 to January 2020 is therefore notable. (*See* D.I. 11 at 4).

The strength of the actual confusion events Plaintiff presents is further undermined when I consider the nature of some of the evidence. The probative value of a misdirected communication, like some of the evidence Plaintiff has submitted in which the parties "thought [they were] dialing G-O-L-I" (D.I. 12-1, Ex. 1 at 4), for example, is decreased when the Court cannot tell whether the mistake resulted from the author's confusion of the parties' similar marks or from inadvertence. *See Checkpoint Sys.*, 269 F.3d at 298; *see also Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996) (misdirected communications that are not a result of the sender's confusion of the parties' marks are not evidence of actual confusion). Goli states that twenty-four of Plaintiff's initially identified fifty-eight communications appear to

be misdirected communications. (D.I. 29 at 16). The Court's independent review suggests that at least some of these communications are those wherein consumers intended to contact Goli and contacted GOLO instead. Plaintiff has not provided affidavits or testimony on the part of the authors of the misdirected communications that would provide the Court with useful context for evaluating whether the communications were the result of confusion between the parties' marks. *See Componentone*, 2008 WL 4790661, at *20.

"In borderline cases where evidence of actual confusion is not available or is not overwhelming, the gap should be filled by a properly conducted survey of the relevant class of prospective customers of the goods or services at issue." *Urban Outfitters v. BCBG Max Azria Grp., Inc.*, 511 F. Supp. 2d 482, 498 (E.D. Pa. 2007). A survey can serve as circumstantial evidence of actual confusion, "but only to the extent that the survey replicates the real world setting in which instances of actual confusion would occur." *Id.* "When the percentage results of a confusion survey dip below 10%, they can become evidence which will indicate that confusion is not likely." 5 *McCarthy on Trademarks* § 32:189 (collecting cases). Here, Defendant's trademark survey expert Mr. Poret conducted two different surveys. In the first, Mr. Poret found a 0.5% net confusion rate, in the second, a zero percent confusion rate.  (D.I. 29 at 16).

Plaintiff criticizes the reliability of Mr. Poret's surveys, arguing that the Court should disregard them because Mr. Poret surveyed an under-inclusive universe; surveyed a universe biased in Goli's favor; inappropriately used an *Eveready* survey; presented the stimuli to the respondents in a manner biased in Goli's favor; used an inadequate or no control; used unambiguous and imprecise questions; and did not pretest either of the surveys. (D.I. 46 at 5-6). I do not dismiss these surveys at this stage, but the criticisms by Plaintiff's expert give me enough pause that I do not rely upon them.

Viewing all the actual confusion evidence in context, including in light of the large number of customers that Plaintiff has, and considering the relevant law, I conclude that the evidence of confusion that Plaintiff has presented amounts to "isolated and idiosyncratic" instances of actual confusion. *See McNeil Nutritionals*, 511 F.3d at 366. Plaintiff's post-purchase actual confusion demonstration is not strong enough to weigh the sixth *Lapp* factor in its favor. On balance, both the fourth and sixth *Lapp* factors do not weigh strongly for or against finding a likelihood of confusion.

### 6.    Marketing or Advertising Through the Same Channels (*Lapp* Factor Seven), Targets of the Parties' Sales Efforts (*Lapp* Factor Eight), and Relationship of Goods in Consumers' Minds (*Lapp* Factor Nine)

Under the seventh *Lapp* factor, I examine "whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media." *A & H Sportswear*, 237 F.3d at 215. This factor looks at the "media the parties use in marketing their products as well as the manner in which the parties use their sales forces to sell their products to consumers." *Kos Pharms.*, 369 F.3d at 722. "The greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." *Sabinsa*, 609 F.3d at 188.

The eighth *Lapp* factor requires me to consider "the extent to which the targets of the parties' sales efforts are the same." *A & H Sportswear*, 237 F.3d at 215. The ninth *Lapp* factor requires the court to consider "the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors." *Id*. "The question is whether the consumer might therefore reasonably conclude that one company would offer both of these related products." *Fisons*, 30 F.3d at 481.

Both parties market their products, both described as "nutritional supplements," on Facebook, Pinterest, and Instagram, as well as on television. (D.I. 11 at 16). The parties also share channels of trade: they both sell their products through their respective websites and www.walmart.com. (*Id.*). Defendant also has a large presence on Amazon.com while Plaintiff does not use the platform at all. (D.I. 29 at 18). While both parties sell on Walmart.com, that site accounts for 0.1% of Defendant's sales. (*Id.* at 17). Defendant contends that the parties sell different products, to different consumers, in different ways. (*Id.*). I agree that the products are different. Whereas Plaintiff's weight loss product competes with other diet plans, Defendant's gummies compete with other nutritional supplementation products, including companies selling gummies that contain apple cider vinegar.

That the two parties advertise and sell on the Internet has become largely irrelevant to this factor. *See Healthbox Global Partners, LLC v. Under Armour, Inc.*, 2016 WL 3919452, at *7 (D. Del. July 19, 2016). "Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011).

Plaintiff emphasizes that Defendant has touted the weight-loss properties of its gummies many times, in many ways. (D.I. 46 at 8; citing D.I. 13-1, Ex. B, D.I. 31, Ex. A at 1, D.I. 30-1 at 11, n.2). Defendant has an Instagram advertisement that states, "Goli makes weight loss . . . simple!" and that Goli gummies offer "[a] simple way to reach health goals like weight control." (D.I. 46 at Ex. BB). While both products offer weight loss benefits, Plaintiff's product is a capsule, while Defendant's product is a chewable gummy. Plaintiff's product appears to be specifically designed for weight loss and is accompanied by a weight loss program booklet—a

24

consumer must first buy the whole plan before purchasing additional refills of the Release pill, which is advertised as targeting insulin resistance to promote fat loss. Defendant's product is marketed as a chewable apple cider vinegar nutritional supplement that promotes a variety of health benefits, including weight management.

The parties target different consumers—individuals actively seeking to lose a certain amount of weight for Plaintiff and individuals seeking to support their overall health, including manage their weight, for Defendant. This lessens the overlap in channels such as social media or other marketing campaigns. Although the customers of both products are interested in improving their health, including through weight loss and control, GOLO describes its product as specifically intended to target weight loss by combatting insulin resistance through its metabolic health program and Release pill. Goli, on the other hand, promotes its product as containing various benefits of apple cider vinegar, including supporting gut health for healthy digestion, supporting healthy weight management, reducing appetite, supporting a healthy immune system, supporting heart health, and helping to improve energy. Both products are categorized on Walmart's website as "Weight Management" products. But within that category, GOLO's product is sub-categorized under "Weight Loss Pills," and Goli's product is sub-categorized under "Natural Weight Management."

"When two products are part of distinct sectors of a broad product category, they can be sufficiently unrelated that consumers are not likely to assume the products originate from the same mark." *Checkpoint Sys.*, 269 F.3d at 288. Given the differences in the products' intended usage, the GOLO weight loss program and Release pill and the Goli gummy supplement are directed to different consumers. *See Zalatel v. Prisma Labs, Inc.*, 2017 WL 877302, at *6 (D. Del. Mar. 6, 2017).

A review of the parties' marketing materials reinforces their use of different strategies that appeal to different segments of customers in the health and wellness market. Plaintiff's Instagram page (@goloforlife) follows the brand's blue and green theme and features weight loss content, including motivational quotes, testimonials, healthy meal suggestions, and photos of people who have lost weight with GOLO. (D.I. 34-1, Ex. A). Defendant's Instagram page (@goligummy) adheres to its red theme and the posts are mostly of young people enjoying the Goli gummy or of the Goli bottle. (D.I. 31-1, Ex. F). Defendant's Facebook page focuses on the gummy's palatable approach to apple cider vinegar. (*Id.*, Ex. G).

On balance, these factors weigh against finding a likelihood of confusion.

### 7.   Weighing the *Lapp* Factors

GOLO and Goli are similar in sound, but not appearance. GOLO is suggestive, alluding to "go low," which might distinguish its mark from that of Goli or a similar product with an entirely made-up name. The products in question are both related to weight management to some degree, but GOLO is specifically directed at weight loss through combatting insulin resistance, whereas Goli is marketed as a nutritional supplement that contains the health benefits of apple cider vinegar. While there have been some instances of actual confusion, they mostly appear to occur when customers are more prone to carelessness, that is, after sales have occurred.

On balance, the *Lapp* factors weigh against finding a likelihood of confusion.  Thus, I do not find that Plaintiff has shown a likelihood of success on the merits.

### B.  Irreparable Harm

A plaintiff must demonstrate a likelihood – not just a possibility—of irreparable harm in the absence of an injunction. *Ferring*, 765 F.3d at 217 (citing *Winter*, 555 U.S. at 22). To satisfy the irreparable harm requirement, the plaintiff must demonstrate a significant risk of harm that cannot adequately be compensated by monetary damages. *See Adams v. Freedom Forge Corp.*,

204 F.3d 475, 484-85 (3d Cir. 2000). The "availability of money damages for an injury typically

will preclude a finding of irreparable harm." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 n.4

(3d Cir. 2017). "Grounds for irreparable injury include loss of control of reputation, loss of trade,

and loss of goodwill." *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 f.3d 800, 805 (3d

Cir. 1998). A "critical aspect" of fact-finding in this context is "drawing reasonable inferences

from facts in the record." *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 205

(3d Cir. 2014). The court may only grant a preliminary injunction when a plaintiff has made a

clear showing of a likelihood of irreparable harm. *Id.* at 204; *Reilly*, 858 F.3d at 179.

Plaintiff argues that as a result of Goli's use of its mark, GOLO has lost control of its

hard-earned reputation in the marketplace and the goodwill associated with its GOLO mark and

trade name. (D. I. 11 at 17). GOLO asserts that this constitutes irreparable harm that money

alone cannot remedy, and only an immediate injunction will prevent further harm to GOLO, its

mark, and its name. (*Id.* at 18).

The irreparable harm and likelihood of confusion analyses are distinct. Plaintiff argues

that Goli gummy supplement is "directly competitive" with the GOLO nutritional supplement

(but does not explain how or why they directly compete). (*Id.*). Defendant sells Goli gummies on

its website  (www.goli.com), and Plaintiff sells its product and services on its website

(www.golo.com). (*Id.*). And Defendant sells the Goli gummies for less than Plaintiff's product.

(*Id.*). Plaintiff contends, "These facts place the GOLO reputation at perilous risk . . . Among the

many instances of actual confusion is a disgruntled consumer who, having been duped into

thinking GOLI and GOLO are the same, mistakenly believes that GOLO has engaged in

'misrepresentation or bait and switch!'" and threatens to sue. (*Id.* at 18-19).[13] But Plaintiff cannot establish a likelihood of irreparable harm based only on evidence supporting a likelihood of confusion between the marks. *See Ferring*, 765 F.3d at 216.

Plaintiff has failed to meet its burden to produce evidence showing there is a non-speculative likelihood of irreparable harm. *See id.* at 219. A key lesson from *Ferring* is that Courts considering whether to grant injunctive relief must exercise their equitable discretion in a case-by-case, fact-specific manner. *Id.* at 214. A critical aspect of fact-finding in this and other contexts is drawing reasonable inferences from facts in the record. *See generally Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

The inference that Plaintiff is likely to suffer irreparable harm to its brand reputation and goodwill is not supported by the facts. The evidence of record does not demonstrate that GOLO has a particular reputation among consumers, or that its recognized by consumers to generate goodwill. There is no evidence here that Plaintiff's product enjoys a strong reputation as the premier weight loss or, even more broadly, weight management and nutritional support brand on the market. *See Groupe SEB USA*, 774 F.3d at 205. As Plaintiff's product is sold exclusively online (D.I. 11 at 18), there is no concern that the parties' products are sold side-by-side on retail shelves. *See id.*

Plaintiff needs to make a "clear showing" of harm to reputation and goodwill to constitute irreparable harm, such that the "extraordinary remedy" of preliminary injunctive relief is warranted. *Winter*, 555 U.S. at 22; *Kos Pharms.*, 369 F.3d at 708. What Plaintiff offers is a

---

[13] I note that nothing in the record suggests that "GOLI," in all capital letters, is a form of the mark that Defendant ever uses. "GOLI" appears only in Plaintiff's briefing.  The Goli trademark 'consists of standard characters without claim to any particular font style, size or color." (D.I. 34-1, Exh. B).

series of complaints to GOLO from disgruntled consumers who purchased Goli's product and are dissatisfied with the product for some reason, or who purchased GOLO Release, but intended to purchase Goli gummies.  For example, Plaintiff presents evidence of a consumer who seems to have intended to purchase gummies ("your ads … talk about chewable"), but received GOLO Release and the accompanying plan, complaining to GOLO that he was "ripped off and will tell everyone I can not to buy your product."[14] (D.I. 11 at 19; D.I. 12-1, Ex. 5). Without more, for example, evidence that this particular customer has a platform where their opinions on health-related products are well regarded, or even considered, by customers, it is hard to infer that any consumer goodwill that Plaintiff does have will be even minimally diminished. And as discussed previously, there is no evidence of record that Plaintiff maintains a particular reputation in the marketplace in the first instance. In some examples offered by Plaintiff to show that consumers were confused by the parties' products, once alerted to their mistake, consumers who had contacted GOLO instead of Goli acknowledged their mistake. (*See, e.g.*, D.I. 12-1, Ex. 4, 8, 36a). There are no further facts to support an inference that these individuals hold GOLO in disrepute.

The Supreme Court has made clear that a "possibility" standard of irreparable harm is "too lenient" and is "inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled

---

[14] The complete email chain suggests the customer was not a reasonably prudent purchaser.  He ordered a diet plan and Release thinking he was ordering gummies.  His first email says, "I ordered GOLO and got alot of paper and Release I feal like I got ripped off.  When I order something I think thats what I want."  GOLO responds by identifying itself as GOLO, saying that it sells a supplement called Release, and then asking what the customer thought he was ordering.  His second email says, "your ads do not say that thay talk about chewable not the thing you sent me.  I still think I was ripped off and will tell everyone I can not to buy your product." After a second response from GOLO suggesting the customer was confusing GOLO with Goli, which sells gummy ACV supplements, the customer's third email said, "your double talk is nuts I will go on line and tell the world that this is a big rippoff you can't get what you order.  I would send it back but I put it where it should go in the trash."  (D.I. 12-1, Ex. 5).

to such relief." *Winter*, 555 U.S. at 22. Plaintiff has not shown any lost sales as a result of any activity of Defendant nor any harm in the marketplace, or any injury amounting to irreparable harm. Comparatively isolated instances of upset consumers, in the context of the 500,000 customers that Plaintiff claims, are not enough to overcome the "clear showing" standard set forth by the Supreme Court. *See id.*

Because the evidence of record does not support a finding of irreparable harm, I will deny Plaintiff's motion for a preliminary injunction. "[A] movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits . . . and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly*, 858 F.3d at 179. The Court considers the remaining two factors only if the first two "gateway factors" are satisfied. *Id.* Consequently, I need not reach an analysis of the balance of hardships and public interest.

## IV.    CONCLUSION

A preliminary injunction is "an extraordinary remedy, which should be granted only in limited circumstances." *Kos Pharms.*, 369 F.3d at 708. Plaintiff has failed to make a clear showing of entitlement to such relief. *See Winter*, 555 U.S. at 22. Therefore, I will deny Plaintiff's motion for a preliminary injunction. An accompanying order will be entered.